**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SETH FREED WESSLER,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE and UNITED STATES MARSHALS SERVICE,<br><br>      Defendants. | No. 17-CV-976 (SHS) |

**DECLARATION OF SETH FREED WESSLER**

I, Seth Freed Wessler, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information and belief:

1.     I am an investigative reporter based in New York and a Fellow at The Investigative Fund of the Nation Institute. My reporting has appeared in outlets including The New York Times Magazine, Reveal, This American Life, The Nation, NBC News and others. I have been a visiting scholar at NYU's Arthur L. Carter Journalism Institute, a Soros media fellow, and a staff reporter for NBC News and Colorlines. I have won numerous honors for my work, including the Hillman Prize, the Izzy Award, and the John Bartlow Martin Award for Public Interest Journalism. As a reporter, I have investigated conditions in federal detention and prison facilities, including private facilities that hold contracts with the federal Bureau of Prisons (BOP). *See* Seth Freed Wessler, Special Investigation: Dying in Private Prisons, The Nation, https://www.thenation.com/special/private-prison-deaths/ (last visited August 3, 2018); Seth Freed Wessler and Stan Alcorn, Sick on the Inside, Reveal from the Center for Investigative

Reporting, https://www.revealnews.org/episodes/sick-on-the-inside-behind-bars-in-immigrant-only-prisons/ (last visited August 3, 2018).

2. In 2016, I filed a request under the Freedom of Information Act ("FOIA") for records concerning the detention practices of the United States Marshals Service ("USMS").

3. The USMS is responsible for the pre-trial detention of people charged with federal crimes, but it does not own or operate its own prison facilities. Rather, it negotiates contracts and/or holds agreements with private detention facilities, federal and state prisons and county jails to detain federal pre-trial detainees. The USMS holds over 50,000 people daily. More than 80% of these men and women are held in state, local and private prison facilities.

4. However, little is known about how detainees are held. In 2013, the Department of Justice Inspector General ("DOJ-IG") found that inspections of non-federal facilities by the USMS were often "cursory" and that its oversight and monitoring efforts were inconsistent and undermined by a lack of follow-up to correct deficiencies. The Inspector General also found that USMS also has a troubling incentive to ignore problems that it identifies in those non-federal facilities: it often lacks "alternate options" for facilities in which to house prisoners in its custody, and therefore "cannot remove federal detainees every time a facility is found to be deficient" in an inspection. *See* Compl. ¶¶ 11-25, 33.

5. In April 2017, the DOJ-IG released an audit report about a private facility that has a contract to hold USMS detainees. The audit explained that the USMS has established oversight mechanisms to monitor the jails and prisons that hold USMS detainees. Yet the report discovered vast deficiencies in the USMS's oversight practices. The USMS had not adequately implemented "continuous monitoring processes" and the agency's "mechanisms to hold contractors accountable" were also deemed lacking. The facility was significantly understaffed. The report

noted that some of the identified problems "appear to be inherent in the USMS's overarching continuous monitoring approach," raising concerns for the auditors that the problems may also appear in other facilities that hold USMS detainees. Perhaps most significantly, the audit discovered that the USMS does not independently assess the medical care provided to inmates who died in custody. In other words, the USMS itself may not know if its own detainees are treated according to baseline medical standards. *See* Office of the Inspector Gen., U.S. Dep't of Justice, Audit of the United States Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Detention Center Leavenworth, Kansas (2017), available at https://oig.justice.gov/reports/2017/a1722.pdf.

6. In part because of the failures on the part of the USMS identified by the DOJ-IG, this FOIA request to the USMS seeks information and records concerning the facilities in which USMS detainees are held; how the USMS monitors these facilities; and the medical care provided to individuals in USMS custody who have died in such facilities.

7. My investigation of the detention practices of the USMS is similar in many respects to reporting I did in 2015 and 2016 concerning the treatment of prisoners in private prison facilities contracted by the federal Bureau of Prisons to hold noncitizens convicted of federal crimes.

8. The BOP reporting was based in large part on documents I obtained through several FOIA requests to the BOP, including monitoring reports and medical records of medical care provided to federal prisoners held in private prisons with BOP contracts.

9. In the BOP case, after bringing suit to compel the BOP to comply with my FOIA requests, I received the full BOP medical files of people who had died while held as inmates in BOP contract facilities. *See Wessler v. Federal Bureau of Prisons, et al.*, No. 14 Civ. 5627

(PAE). The medical files included records from the medical clinics inside of facilities, including but not limited to doctor and nurse notes, test and lab results, post-mortem reports, autopsy reports, as well as internal and external mortality investigations and reviews. They also contained all medical records from care provided to inmates outside of the facility, including lab results, test results, and nurse and doctor notes from off-site hospitals and clinics.

10. As part of my investigation, I worked with a team of medical doctors who diligently reviewed the medical records. I asked them first to read the records to help me to establish the facts of the illness or cause of death and of the attendant medical case and, second, to assess the quality of the care provided, and to pinpoint areas of concern, based on the records. Ultimately, I asked the doctors to opine on the quality of the medical care and whether the medical care as documented in the files appeared to align with recognized medical standards.

11. The doctors reviewing the records, however, required access to the full medical files to perform a meaningful review, including all notes and forms from providers, inmate complaints and notes, lab reports, test results, autopsy and coroner reports, investigative reports, and all other medical care-related records.

12. In most cases, because the BOP produced each detainee's full medical record (with minor redactions), the doctors had the information they needed to perform these reviews.

13. However, in about one-third of the BOP cases, certain documents were missing from the files provided by the BOP – most often doctor's notes, lab reports and test results from outside clinics and hospitals – because they had not been placed in the local prison's medical files and were therefore not available to the BOP.

14. In these cases, the doctors reviewing those files were unable to meaningfully evaluate the medical care that had been provided. The doctors told me that they could not opine

on the quality of care, nor provide a meaningful narrative summary of the medical care that had been provided, because the files were simply too incomplete to allow for a substantive review. As a result, I was forced to exclude these cases from my reporting on medical care in the prisons.

15. Through the investigation of private prisons that are contracted to hold BOP inmates, I was able to draw important conclusions about the medical care provided to noncitizens in BOP custody, and about the BOP's policies and practices with respect to the private prison facilities that held them.

16. In at least 25 of the 103 deaths for which the BOP provided complete or nearly-complete medical files, my panel of independent medical reviewers identified signs of inadequate medical care that, the doctors concluded, likely contributed to a premature death. *See* Seth Freed Wessler, The 25 Men Whose Lives Ended Under Questionable Circumstances, The Investigative Fund (Feb. 15, 2016), *available at* https://www.theinvestigativefund.org/blog/2016/01/28/25-men-whose-lives-ended-questionable-circumstances/.

17. Indeed, my reporting showed that the BOP repeatedly ignored recommendations from its own monitors and contracting officials as dozens of immigrants died in the wake of medical neglect in private prisons. For instance, I documented the BOP's failure to correct serious deficiencies in the medical care provided to prisoners at a facility in Reeves County, Texas. Prisoners at Reeves rioted in late 2008 and early 2009 after the death, as the result of a seizure, of a man who was left in solitary confinement for a month without proper treatment for his epilepsy. Although BOP monitors began to visit the facility more regularly in the aftermath of the riots, their visits had little effect because Reeves repeatedly failed to fix the problems the monitors identified. *See* Seth Freed Wessler, Separate, Unequal and Deadly, The Investigative

Fund (Jan. 27, 2016), *available at* https://www.theinvestigativefund.org/investigation/2016/01/27/separate-unequal-deadly/.

18. In fact, the medical records produced by the BOP showed that at least two other men died after receiving inadequate medical care at Reeves in the years following the riots. I could discern and investigate the stories of their deaths and of the care they were provided because I had access to their complete medical files.

19. Martin Acosta began complaining of abdominal pain late in the summer of 2010 and, although he visited the clinic more than 20 times over the next four and half months, even telling a nurse that he had vomited a dark substance and had seen blood in his stool, he went months without seeing a doctor before being diagnosed in December with severe metastatic stomach cancer; Acosta died in January 2011. *See id.*

20. Another man, Claudio Fagardo-Saucedo, tested positive for tuberculosis when he arrived at Reeves in 2009, but he was not tested for HIV as BOP protocol requires of people with positive TB results. In July of 2010 and again in December of 2010, BOP monitors faulted the prison for the medical care it provided to inmates with infectious diseases, including its failure to test inmates with a positive tuberculosis screen for HIV. Despite his positive tuberculosis screen, Fagardo-Saucedo was never tested for HIV at Reeves, but he began complaining of pain weeks after arriving there. Although he went to the clinic 18 times over the next two years with similar complaints, he was never seen by a doctor. On January 1, 2011, Fagardo-Saucedo collapsed and, later that day, was rushed to the emergency room. A nearby hospital diagnosed him with HIV, and he died four days later of an HIV-related infection in his brain. In the months after Fagardo-Saucedo's death, the BOP extended its contract for the Reeves facility; in early 2015, BOP

6

monitors again cited the facility for failing to properly follow up on positive tuberculosis tests. *See id.*

21. My investigation also revealed systemic shortcomings in the provision of health care in the BOP's private prisons. While federal, BOP-run facilities typically use registered nurses, physician assistants and nurse practitioners to perform routine medical care, private prisons often employ less trained (and less expensive) licensed vocational nurses (LVNs) to do much of the same work. LVNs receive only one year of training and are taught how to change dressings, check blood pressure, help patients bathe, and gather basic information so that they can serve as support staff, but are not qualified to evaluate patients or make treatment decisions. Yet I discovered, during my review of the medical records of men who died in the BOP's private prisons, that LVNs were often the sole caregiver a sick prisoner would see for days or weeks. According to the doctors who reviewed the medical records to assist me in my reporting, for at least 19 deaths, the overuse of LVNs (or the use of LVNs in roles they were unqualified for) was cited as a factor impeding proper medical care. *See id.*

22. On August 18, 2016, in the wake of my reporting, the Justice Department directed the Bureau of Prisons to phase out – and ultimately end completely – its use of privately-operated prisons. *See* Memorandum from Sally Q. Yates, Deputy Attorney General., U.S. Dep't of Justice, to Acting Director, Federal Bureau of Prisons, "Reducing Our Use of Private Prisons" (August 18, 2016), *available at* https://www.justice.gov/opa/file/ 886311/download. The administration's decision to begin closing these facilities generated significant public interest. Matt Zapotosky & Chico Harlan, *Justice Department Says it Will End Use of Private Prisons*, WASH. POST (Aug. 18, 2016), https://www.washingtonpost.com/ news/post-nation/wp/2016/08/18/justice-department-says-it-will-end-use-of-private-prisons/; Charlie Savage, *U.S. to Phase*

*Out Use of Private Prisons for Federal Inmates*, N.Y. TIMES (Aug. 19, 2016), https://www.nytimes.com/2016/08/19/us/us-to-phase-out-use-of-private-prisons-for-federal-inmates.html; Carrie Johnson, *Justice Department Will Phase Out Its Use Of Private Prisons*, NATIONAL PUBLIC RADIO (Aug. 18, 2016), https://www.npr.org/sections/ thetwo-way/2016/08/18/490498158/justice-department-will-phase-out-its-use-of-private-prisons; Julia Edwards, *U.S. to Phase Out Federal Use of Private Prisons*, REUTERS (Aug. 18, 2016), https://www.reuters.com/article/us-usa-prisions-idUSKCN10T1P7; Seth Freed Wessler, Justice Department to End All Federal Private Prisons, Reveal from the Center for Investigative Reporting, https://www.revealnews.org/article/justice-department-to-end-all-federal-private-prisons-following-nation-investigation/ (last visited August 3, 2018);  Grassroots Leadership, BREAKING: Federal Bureau of Prisons to end private prison contracts in historic move (Aug. 18, 2016), https://grassrootsleadership.org/releases/2016/08/breaking-federal-bureau-prisons-end-private-prison-contracts-historic-move; Carl Takei, "The Justice Department's Call to Axe Private-Prison Contracts Is A Victory. ICE Must Now Do the Same to End Federal Prison Profiteering.", The American Civil Liberties Union (Aug. 19, 2016), https://www.aclu.org/blog/ prisoners-rights/cruel-inhuman-and-degrading-conditions/justice-departments-call-axe-private.

23. That directive was rescinded only a few months later by the current administration. *See* Memorandum for the Acting Director, Federal Bureau of Prisons, "Rescission of Memorandum on Use of Private Prisons," (Feb. 21, 2017), *available at* https://www.bop.gov/resources/news/pdfs/20170224_doj_memo.pdf. The decision to keep these facilities open was, likewise, a matter of significant public concern. Matt Zapotosky, *Justice Department Will Again Use Private Prisons*, WASH. POST (Feb. 23, 2017), https://www.washingtonpost.com/world/national-security/justice-department-will-again-use-

8

private-prisons/2017/02/23/da395d02-fa0e-11e6-be05-1a3817ac21a5_story.html?utm_term =.4ae6bc4935db; Del Quentin Wilber, *Justice Department rescinds order phasing out use of private prisons*, L.A. TIMES (Feb. 23, 2017), http://www.latimes.com/politics/washington/la-na-essential-washington-updates-justice-department-rescinds-order-1487893081-htmlstory.html; Beth Reinhard, *Trump Administration Revokes Plan to Cut Use of Private Prisons*, THE WALL STREET JOURNAL (Feb. 24, 2017), https://www.wsj.com/articles/trump-administration-revokes-plan-to-cut-use-of-private-prisons-1487896642; Eric Lightblau, Justice *Department Keeps For-Profit Prisons, Scrapping an Obama Plan*, N.Y. TIMES (Feb. 23, 2017), https://www.nytimes.com/2017/02/23/us/politics/justice-department-private-prisons.html; Lorelai Laird, *Trump Administration Reverses Federal Plans to Phase Out Use of Private Prison Facilities*, ABA JOURNAL (Sept. 2017), http://www.abajournal.com/magazine/article/prison_private_business_trump_phaseout; Ellen Powell, *Sessions Memo: Reversal on Private Prisons Could Portend Shift on Justice, Observers Say*, THE CHRISTIAN SCIENCE MONITOR (Feb. 24, 2017), https://www.csmonitor.com/USA/Justice/2017/0224/Sessions-memo-Reversal-on-private-prisons-could-portend-shift-on-justice-observers-say.

24. The FOIA request I submitted to the USMS for medical records of individuals in the custody of USMS who have died in state, local and private prisons and jails is not meaningfully different, in terms of the nature and content of the records at issue, from the FOIA request I submitted to the BOP.

25. On May 17, 2018, the USMS produced records responsive to items 16 and 17 of my FOIA request, pertaining to the medical records of individuals who have died in USMS custody, for seven individuals. However, the USMS withheld certain records under FOIA exemptions 6 and 7(C). Compared to the records I received from the BOP, key documents are

missing from each file: lab reports and test results, notes and medical observations from the doctors and nurses who provided the care, internal and external reviews and investigations of the deaths, mortality and autopsy reports, referral sheets, records from off-site hospitals, clinics, ambulances and labs, and medical and mental health evaluations.

26. Since receiving those records, I have asked some of the same medical doctors who reviewed the medical records produced by the BOP to review the incomplete records produced by the USMS. According to those doctors, for most of these new USMS files, the records produced by the USMS do not contain enough information to allow for a meaningful review of the medical care that was provided to the deceased prisoner. Indeed, in some cases, the doctors cannot discern the precise cause of death, let alone the story of what led to the death.

27. As a result, the records, as they have been produced, do not allow for meaningful analysis regarding the medical care provided to USMS detainees in state, local and private prisons and jails.

28. Without the records, the public will remain in the dark about how USMS detainees are cared for while in custody, even as the plight of prisoners and of detainees, including issues related to medical treatment, continues to be a matter of great and sustained interest to the public. Timothy Williams, *Inside a Private Prison: Blood, Suicide and Poorly Paid Guards*, N.Y. TIMES (Apr. 3, 2018), https://www.nytimes.com/2016/05/12/nyregion/health-care-at-new-jersey-immigrant-jail-prompts-claim.html; Human Rights Watch, Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention (2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention; David Gambacorta, *Dead Bodies and Billions in Tax Dollars: The Secret, Dangerous World of Private Prisons*, THE PHILA. INQUIRER (Aug. 17, 2017),

http://www.philly.com/philly/news/crime/private-prisons-sessions-yates-geo-assault-death.html; Josh Kovner, *Citing Eight Inmate Deaths, 'Failure' In Prison Medical Care, Lawmakers Call For Inquiry*, THE HARTFORD COURANT (Mar. 14, 2018), http://www.courant.com/news/connecticut/hc-news-inmate-medical-care-fasano-0314-story.html; Robin Urevich, *Amid Crackdown, Immigrants Are Dying Of Neglect In ICE Detention Facilities*, Fastcompany.com (Apr. 27, 2017), https://www.fastcompany.com/40413660/amid-crackdown-more-immigrants-are-dying-in-ice-detention-facilities; Sandra Hausman, Investigating Alleged Medical Neglect in U.S. Prisons, The Center for Health Journalism, https://www.centerforhealthjournalism.org/resources/lessons/investigating-alleged-medical-neglect-us-prisons.

29. Among the members of the public who are likely to remain in the dark are the families of the deceased, who often learn little about their relative's death. In my past reporting on medical neglect in prisons, the families of the deceased have in every case expressed gratitude when, as is my practice, I have contacted them in the process of investigating and/or before publishing stories about their relative. This is true of cases in which there is evidence that the death was natural and unavoidable and in cases where the medical files raise questions about the quality of care. In some of the latter cases, my reporting has led to lawsuits by families, and in at least one case, a settlement with a family in a wrongful death suit.

I declare under penalty of perjury that the foregoing is true and correct.

_____     _08/03/18_____
Seth Freed Wessler                                    Date

11